**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

TEMPUR-PEDIC NORTH AMERICA,
LLC; TEMPUR-PEDIC MANAGEMENT,
LLC; and  DAN-FOAM ApS,

     Plaintiffs,

vs.

                              CASE NO.:  8:18-CV-02147-VMC-SPF

MATTRESS FIRM, INC.; THER-A-PEDIC
ASSOCIATES, INC.; SINOMAX GROUP
LIMITED, and SINOMAX USA, INC.,

     Defendant.

_____ /

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTIONS FOR**
**TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Pursuant to Federal Rules of Civil Procedure 65(a) and (b), and Local Rules 3.01(a), 4.05 and 4.06, Plaintiffs file this Memorandum in Support of their Motions for Temporary Restraining Order and Preliminary Injunction.

**I.**     **INTRODUCTION**

This is a case of a recidivist trademark infringer who, having had authorized access to Plaintiffs' valuable Tempur-Pedic trademarks, did not realize just how valuable that access was until it lost those rights.  As a result, it now is resorting to an intentional scheme to confuse consumers into believing, wrongly, that it is again an authorized vendor of Tempur-Pedic products, thus causing irreparable harm to Plaintiffs and the consuming public.

Prior to January 2017, Plaintiff Tempur-Pedic North America LLC ("Tempur") supplied Defendant Mattress Firm, Inc. ("MF") with Tempur-Pedic brand bedding products

for resale for nearly twenty years.  During that time, MF branded itself as the number one bedding retailer of Tempur-Pedic products in the United States.  In January 2014, Tempur and MF entered into a Master Retailer Agreement (the "MRA") pursuant to which MF continued as an authorized retailer.  In addition to the right to sell Tempur-Pedic products, the MRA also gave MF the right to use Tempur-Pedic's brand, including its trademarks, trade dress, advertising and other elements that contribute to its overall look and feel.

MF announced its intention to terminate the MRA in late January 2017.  After waiting nearly a week for MF to follow through, Tempur terminated the MRA with immediate effect.  The parties then negotiated a brief extension for MF to continue selling Tempur-Pedic products until April 3, 2017.  But MF did not immediately cease use of the Tempur-Pedic brand at that time.  Instead, MF used the Tempur-Pedic brand on the MF website to sow confusion among consumers as to the ongoing connection between MF and Tempur.  By doing so, MF infringed the Tempur-Pedic trademark until it was preliminarily enjoined from doing so by a judge of the United States District Court for the Southern District of Texas (the "Texas Action") in July 2017.

Now, barely a year later, MF is back at it.  Teetering on the edge of bankruptcy, MF, with the help of its co-defendants, has decided to go all in on its campaign of deception by executing an elaborate scheme of infringement and market confusion.  After seeing Plaintiffs' state-of-the-art Pro-Adapt series mattresses at the world's largest industry tradeshow in January 2018, MF decided to copy them.  In an obvious attempt to obtain the appearance of legitimacy, MF entered into a license agreement with Defendant Ther-A-Pedic Associates, Inc. ("Therapedic"), the owner of the Therapedic trademark (the "Therapedic

Mark") to use the Therapedic Mark in a manner, previously never used, nearly identical to the Tempur-Pedic trademarks. MF also commissioned Defendants Sinomax Group Limited ("Sino-CH") and Sinomax USA, Inc. ("Sino-US") (together, "Sinomax") to manufacture, import, and distribute mattresses that look exactly like Plaintiffs' Pro-Adapt mattresses, including by use of the Therapedic Mark.

And for its final touch, MF designed marketing materials that have the same "look and feel" and overall commercial impression as the Tempur-Pedic marketing materials. For example, MF is setting up its stores to use a "gallery" format to showcase the infringing goods—a style that MF used exclusively for Tempur-Pedic goods when it was an authorized retailer. It also is prominently displaying a version of the Therapedic Mark that is nearly identical looking in appearance to the Tempur-Pedic trademark, using color schemes that further enhance the false notion that the authentic goods and the infringing products are one and the same.

The appearance of Therapedic products and how they are displayed are virtually indistinguishable from the Tempur-Pedic products and how they are displayed. The trademarks and the trade dress are nearly, and confusingly, identical. Given the fame of Tempur-Pedic, the history between the parties, and the egregious copying, Defendants are *willfully* infringing the Tempur-Pedic trademarks and trade dress, and the whole of the Tempur-Pedic brand.

Because MF was an authorized retailer of Tempur-Pedic products for nearly twenty years—the self-described number one Tempur-Pedic bedding retailer in the country, no less—and because it continued in that role until just last year, consumers inevitably will be

confused. Indeed, even a Mattress Firm salesperson in Gainesville was struck by the similarity of the Therapedic mattresses to Tempur-Pedic products. If a trained salesperson believes that they look similar, no doubt consumers will believe that MF is still an authorized seller of Tempur-Pedic products *when it is not*. They will enter MF stores thinking MF sells Tempur-Pedic products *when it does not*. And they will spend thousands of dollars at MF to purchase products carrying the Therapedic name thinking they are Tempur-Pedic products *when they are not*. Tempur-Pedic is being severely and irreparably harmed by the confusion Defendants are causing, as well as loss of sales, goodwill and control over its reputation. Plaintiffs respectfully ask this Court to act swiftly to enjoin Defendants' conduct.

## II.    FACTS MERITING RELIEF

### A.    TEMPUR-PEDIC'S BRAND[1]

Tempur-Pedic is among the most well-known suppliers of premium bedding products, including mattresses, pillows, and other comfort products, in the United States.[2] Tempur-Pedic has grown significantly since its launch in 1992.[3] Its products are sold at more than 8,000 authorized retail locations throughout the United States (the "Authorized Retailers").[4] They are also sold at Tempur-Pedic's 46 stand-alone retail locations (the "Tempur-Pedic Stores").[5]

### 1.    Tempur-Pedic's Trademarks

Tempur-Pedic owns multiple trademarks consisting of the word TEMPUR-PEDIC

---

[1] Plaintiffs are referred to collectively as "Tempur-Pedic."
[2] *See* Declaration of Richard W. Anderson ("Anderson Dec.") at ¶ 3.
[3] *Id.* at ¶ 10.
[4] *Id.* at ¶ 4.
[5] *Id.*

4

(the "Tempur-Pedic Marks"), including design marks.  Many of the Tempur-Pedic Marks have been registered with the United States Patent and Trademark Office ("USPTO") for a variety of goods and services and are incontestable.  Below are two examples of such registrations:[6]

Registration No. 1,853,088                    Registration No. 3,900,919



**TEMPUR-PEDIC**

The Tempur-Pedic Marks are a critical component of the Tempur-Pedic brand, and have been used, advertised and promoted within the United States since as early as 1992.[7]

### 2.    Tempur-Pedic's Trade Dress

Tempur-Pedic owns common law trade dress rights in its Pro-Adapt mattress design, which, as shown in the images below, consists of the following elements: (i) a black/charcoal gray mattress; (ii) a white mattress cover with colored grooves/ridges and colored trim; and (iii) the TEMPUR-PEDIC word mark in white, block letters at the left foot of the mattress (collectively the "Pro-Adapt Trade Dress").[8]



---

[6] *Id.* Exh. A (copies of Tempur-Pedic's trademark registrations for the Tempur-Pedic Marks).

[7] *Id.* ¶ 10.

[8] *Id.* at ¶ 15, Exh. B (images of Pro-Adapt Trade Dress).

Tempur-Pedic launched the inherently distinctive Pro-Adapt Trade Dress at the world's largest industry tradeshow, Las Vegas Market, in January 2018.[9]

Tempur-Pedic owns federal registrations with the USPTO for other elements of its mattress design as well.  As shown in Exhibit 1 attached hereto, these registrations cover the diagonal slants at the corners of the white mattress covers together with specific colored trims (collectively the "Registered Trade Dress").[10] In addition, Tempur-Pedic owns common law trade dress rights in its store display, which, as shown in Exhibit 2 attached hereto, consists of the following elements: (i) Tempur-Pedic mattresses reflecting one or more of the Tempur-Pedic Marks at the left foot of the mattress; (ii) the Registered Trade Dress; (iii) a cloth "runner" or foot protector along the foot of the mattress; (iv) a product description with similar typeface and sizing on the left side of the runner; (v) split-screen posters reflecting the Tempur-Pedic Marks and images of a model or models; and (vi) use of a snowflake design (collectively the "Marketing/Store Display Trade Dress").[11]

The Pro-Adapt Trade Dress, the Registered Trade Dress, and the Marketing/Store Display Trade Dress (collectively the "Tempur-Pedic Trade Dress") are a critical component of the Tempur-Pedic brand, as each individually, and collectively, instantly calls Tempur-Pedic to the consumer's mind.  The Tempur-Pedic Marks, Tempur-Pedic Trade Dress, and other items that contribute to the overall look and feel of Tempur-Pedic, including Tempur-

---

[9] *Id.* at ¶ 13.
[10] Anderson Dec. Exh. C (copies of Tempur-Pedic's trade dress registrations).
[11] *Id.* at ¶ 23, Exh. D, E (images of Tempur-Pedic's Marketing/Store Display Trade Dress at Tempur-Pedic Stores and Authorized Retailers).

Pedic's advertising and consumer experience—all of which were chosen with care—all comprise, and are collectively referred to here as, the "Tempur-Pedic Brand."[12]

The Tempur-Pedic Brand was developed with care and is extremely valuable to Tempur-Pedic.  Each Tempur-Pedic Store, each Tempur-Pedic display at the Authorized Retailers, and every other consumer interaction with Tempur-Pedic was carefully designed to comport with, and instantly call to mind, the Tempur-Pedic Brand.[13]  The Tempur-Pedic Brand was designed to, and does, distinguish Tempur-Pedic from the competition in the minds of consumers.[14]

Since 2005, Tempur-Pedic has invested over $1 billion building the Tempur-Pedic brand in North America.  In 2016 alone, Tempur-Pedic spent more than $61 million on direct advertising.[15]  Tempur-Pedic's marketing spend is justified by its strong sales.  In 2016, Tempur-Pedic shipped approximately $1 billion in Tempur-Pedic products.  Even after abruptly losing MF as its largest customer in 2017, Tempur-Pedic shipped approximately $800 million in Tempur-Pedic products that year.[16]  In 2003, Tempur-Pedic's share price opened at $14; today, the share price for Tempur-Sealy International, Inc. (Tempur-Pedic's parent company) is $57.  The company is valued (market capitalization) at $3.1 billion, and Tempur-Pedic has grown from a start-up company with no revenue to one of the largest bedding manufacturers in the world.

---

[12] *Id.* at ¶ 24.

[13] *Id.* at ¶ 25.

[14] *Id.* at ¶ 26.

[15] *Id.* at ¶ 28.

[16] *Id.*

A significant portion of that value is attributable to the Tempur-Pedic Brand. As a result of Tempur-Pedic's sustained efforts over the course of many years, the Tempur-Pedic Marks have become and currently are famous, and are widely known among the general consuming public of the United States.[17]

**B.      DEFENDANTS' INFRINGEMENT OF THE TEMPUR-PEDIC BRAND**

**1.      Prior Infringement**

Defendants are intimately familiar with Tempur-Pedic and the Tempur-Pedic Brand. Prior to January 2017, Tempur-Pedic supplied MF with bedding products for resale for nearly twenty years. During that time, MF branded itself as the number one bedding retailer for Tempur-Pedic in the United States.[18] In January 2014, Tempur-Pedic and MF entered into the MRA pursuant to which MF continued as an authorized Tempur-Pedic retailer.[19] The MRA gave MF the right to sell Tempur-Pedic's products and to use the Tempur-Pedic Brand.[20]

MF made heavy use of, and depended on, the Tempur-Pedic Brand. The Tempur-Pedic Brand was, and is, so valuable that MF often promoted it more heavily than its own brand to draw consumers into it its retail locations:



---

[17] *Id.* at ¶ 12.
[18] *Id.* at ¶ 29.
[19] *Id.*.
[20] *Id.* at ¶ 30.

MF also relied heavily on the Tempur-Pedic Brand in its store displays and other marketing. Tempur-Pedic was the first brand listed on the MF website, which featured the Tempur-Pedic Brand prominently:



MF announced its intention to terminate the MRA in late January 2017. After waiting nearly a week for MF to follow through on its announced intention, Tempur-Pedic terminated the MRA with immediate effect.[21] At MF's request, the parties then entered into a letter agreement permitting MF to continue ordering Tempur-Pedic products until April 3, 2017.[22]

Even after it ceased selling Tempur-Pedic products, however, MF attempted to use its long-standing affiliation with the Tempur-Pedic Brand to promote the sale of competing products.[23] In May 2017, MF posted on its website a page that offered to tell consumers "Everything you need to know about Tempur-Pedic mattresses," but then directed consumers to links where they could purchase other, non-Tempur-Pedic products.[24] Tempur-Pedic

---

[21] *Id.* at ¶ 35.

[22] *Id.*

[23] *Id.*

[24] *Tempur-Pedic N. Am., LLC v. Mattress Firm, Inc.*, 2017 WL 2957912 (S.D. Tex. July 11, 2017).

sought and obtained an injunction against MF from using the Tempur-Pedic Brand. That injunction remains in place.[25]

## 2. Current Infringement

MF has begun selling mattress products with a confusingly similar name and confusingly similar trade dress in a confusingly similar store environment. The degree of overall similarity presents consumers with an onslaught of intentional and calibrated mimicking, thus rendering confusion inevitable. MF is using the Tampa market (approximately 60 stores) as the test market to launch its infringing goods.[26] If all goes as planned, MF would roll out its Therapedic mattresses elsewhere, irreparably harming Plaintiffs and consumers on a national scale.

Below are images of the Therapedic mattresses being offered for sale, nationwide, on the MF website next to the Tempur-Pedic Pro-Adapt mattresses Defendants are copying:[27]

| Tempur-Pedic | Therapedic |
|:---:|:---:|



Additional images are set forth in Exhibit 3 attached hereto. It is not just Tempur-Pedic making this observation; industry analysts have noted the similarity, too:[28]

---

[25] Id.; Anderson Dec. at ¶ 36, Exh. F (injunction order).

[26] Anderson Dec. at ¶ 55, Exh. L (Raymond James analyst report)

[27] Id. at ¶ 42, Exh. H (images of Therapedic mattresses on MF website).

[28] Id., Exh. L (Raymond James analyst report).





The substantial similarities cannot be denied.  Below and as set forth in Exhibit 4 attached hereto are images of how MF displays the Therapedic products at MF store locations in or around Tampa, Florida next to the Marketing/Store Display Trade Dress Defendants are copying.[29]

<div style="display:flex; justify-content:space-between;">
<strong>Tempur-Pedic</strong>      <strong>Therapedic</strong>
</div>

 

The layout of these goods is known as a gallery format.  MF used the gallery format to sell Tempur-Pedic products when it was an authorized retailer.  Tempur-Pedic itself sells its goods in a gallery format.  And now MF is selling its infringing Therapedic mattresses also in a gallery format, thus adopting the trade dress of the gallery sales floor to further

---

[29] Id., Exh. D, E (photos of Tempur-Pedic Stores and Authorized Retailers), Exh. G (photos of MF locations).

11

confuse consumers.[30]  The Therapedic mattresses also use a color-coding scheme to signal mattress firmness, just as Tempur-Pedic does.[31]  And while the colors are not used identically, some of the same colors are used and are similarly placed along the border of the mattress.[32]  Because of these visual similarities, in addition to the fact that these are all foam mattresses (not traditional spring mattresses), and that the price points are nearly identical,[33] consumer confusion is inevitable.

MF uses the Therapedic Mark pursuant to a license from Defendant Therapedic. While Therapedic owns trademark registrations for the Therapedic mark, none of those registrations is for the stylized manner in which the Therapedic mark is being used on the mattresses sold at MF.  Additionally, Therapedic does not appear to have ever made and, other than its sudden infringing conduct here, is not making use of, the Therapedic mark in the stylized manner in which it is being used on the mattresses sold at MF.[34]

The infringing Therapedic products sold by MF are manufactured by Defendant Sinomax, which is participating in putting these goods into the stream of U.S. commerce. Sinomax also establishes a direct relationship with consumers of the infringing goods by providing warranties for the infringing product.[35]  As a result, consumers who have been confused into believing that the Therapedic goods are Tempur-Pedic products are further misled into concluding that there is a relationship, sponsorship or affiliation between

---

[30] Anderson Dec., Exh. L (Raymond James analyst report).
[31] Id.
[32] Id.
[33] Id.
[34] Id. at ¶¶ 50, 51, Exh. K (copies of USPTO registrations for Therapedic marks, and screenshots from Therapedic website).
[35] Id. at ¶ 44, Exh. I (screenshot of warranty information on MF website).

Tempur-Pedic and Sinomax for the provision of warranties.  But of course, there is no such relationship.

## III.    TEMPUR-PEDIC IS ENTITLED TO A PRELIMINARY INJUNCTION

To issue a preliminary injunction:

> [A] district court need not find that the evidence guarantees a verdict in plaintiff's favor.  Instead, it must determine whether the evidence establishes: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction were not granted; (3) that the threatened injury to the plaintiff[] outweighs the harm that an injunction may cause the defendant; and (4) that granting the injunction would not disserve the public interest.[36]

In applications of this standard, "a district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is appropriate given the character and objectives of the injunction proceeding."[37]  Here, the record establishes a compelling need for preliminary relief.

### A.    TEMPUR-PEDIC IS LIKELY TO PREVAIL ON THE MERITS OF ITS TRADEMARK CLAIMS

Tempur-Pedic is likely to prevail on the merits of its trademark claims because: (1) it has protectable rights in the Tempur-Pedic Brand; and (2) those rights have been violated.[38]

#### 1.    Tempur-Pedic's Rights in the Tempur-Pedic Brand Are Valid

The validity of Tempur-Pedic's rights in the Tempur-Pedic Brand is beyond dispute. The famous Tempur-Pedic Marks are covered by long-held and incontestable registrations

---

[36] *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995); *see also Tally-Ho, Inc. v. Coast Cmty. Coll. Dist.*, 889 F.2d 1018, 1022 (11th Cir. 1989).

[37] *Levi Strauss*, 51 F.3d at 985 (internal quotation marks omitted).

[38] *See generally Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1512 (11th Cir. 1984); *Contemporary Restaurant Concepts, Ltd. V. Las Tapas-Jacksonville, Inc.*, 753 F. Supp. 1560, 1563 (M.D. Fla. 1991) (Moore, II, J.) ("To establish a claim for trademark infringement one must show (1) ownership of the trademark, and (2) the likelihood of confusion of the accused mark with its registered mark.") (citation omitted).

and are entitled to "conclusive evidence" of validity.[39]  The Registered Trade Dress is also covered by federal registrations, which constitute "prima facie evidence" of validity.[40]  In either case, "a registered trademark automatically invokes a statutory presumption that the trademark is valid . . . . [and] shifts the burden of proof to the party challenging the validity of the mark."[41]

As to the unregistered elements of the Tempur-Pedic Brand, namely, the Pro-Adapt Trade Dress and the Marketing/Store Display Trade Dress, their validity is also beyond dispute.  "An identifying mark is distinctive and capable of being protected if it . . . is inherently distinctive . . . ."[42]  A person "can protect a combination of visual elements that taken together may create a distinctive visual impression."[43]

This is the case here.  The elements comprising the Pro-Adapt and Marketing/Store Display Trade Dress create an inherently distinctive visual impression.  Further, none of the elements is individually functional, never mind collectively functional.[44]  Moreover, in both cases, more than one of the claimed elements of the trade dress is, in fact, covered by a federal registration, and its distinctiveness, therefore, is not in question.  The Registered Trade Dress and the Tempur-Pedic Marks are elements of the Pro-Adapt Trade Dress and the Marketing/Store Display Trade Dress.   Adding elements to already conclusively or

---

[39] 15 U.S.C. § 1115(b).

[40] 15 U.S.C. § 1115(a).

[41] *Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc.*, 871 F.2d 590, 593 (6th Cir. 1989) (citing *WSM, Inc. v. Hilton*, 724 F.2d 1320, 1326 (8th Cir. 1984)).

[42] *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992).

[43] *Taco Cabana, Int'l., Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1118 (5th Cir. 1991) (citations, internal quotation marks, ellipses omitted).

[44] *See Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 842 (9th Cir. 1987) ("[The] inquiry is not addressed to whether individual elements of the trade dress fall within the definition of functional, but to whether the whole collection of elements taken together are functional.").

presumptively distinctive elements only increases the overall distinctiveness.  Tempur-Pedic

has established the validity and protectability of its rights in the Tempur-Pedic Brand.

### 2.    Tempur-Pedic's Rights Have Been Violated

Tempur-Pedic is likely to prevail on its infringement, unfair competition and

deceptive trade practices claims.  Liability will attach under either Section 32 or 43(a) of the

Lanham Act[45] if a defendant "falsely suggest[s] affiliation with the trademark owner in a

manner likely to cause confusion as to source or sponsorship."[46]  The test for liability under

Florida law is the same.[47]  Likelihood of confusion  is determined by analysis and balancing

of a number of factors, including:

> (1) the strength of the plaintiff's mark; (2) the similarity between the
> plaintiff's mark and the allegedly infringing mark; (3) the similarity
> between the products and services offered by the plaintiff and the
> defendant; (4) the similarity of the sales methods, *i.e.,* retail outlets or
> customers; (5) the similarity of advertising methods; (6) the defendant's
> intent, *e.g.*, does he hope to gain competitive advantage by associating his
> product with the plaintiff's established mark; and (7) . . . actual
> confusion.[48]

---

[45] 15 U.S.C. §§ 1114, 1125(a).

[46] *Prof'l Golfers Ass'n v. Bankers Life & Cas. Co.*, 514 F.2d 665, 670 (5th Cir. 1975).  The Eleventh Circuit has adopted as binding precedent all Fifth Circuit decisions issued before October 1, 1981.  *See Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981).

[47] *Suntree Techs., Inc. v. Ecosense Int'l, Inc.*, 693 F. 3d 1338, 1345 (11th Cir. 2012) ("The legal standards we apply to the FDUTPA claim are the same as those we have applied under . . . the Lanham Act."); *Contemporary Restaurant Concepts*, 753 F. Supp. at 1562 ("The legal standard for federal trademark infringement and unfair competition and common law trademark infringement are essentially the same.") (citing *Amer. United Life Ins. V. Amer. United Ins.*, 731 F. Supp.480, 486 (S.D. Fla. 1990) (King C.J.).  As this Court has determined, the analysis is the same for trade dress.  *See Bentley Motors Ltd. Corp. v. McEntegart*, 899 F. Supp.2d 1291, 1303 (M.D. Fla. 2012) (Hernandez Covington J.) ("[T]he standards are equally applicable to the trademark infringement and trade dress claim since the factors relevant to determining whether there is a likelihood of confusion between the trade dress of two products are essentially the same as those relevant to determining whether there is a likelihood of confusion between the parties' trademarks.") (citations and internal quotation marks omitted).

[48] *Conagra*, 743 F.2d at 1514; *Contemporary Restaurant Concepts*, 753 F. Supp. at 1563 (same).

A plaintiff need not prove that all or even most of these factors favor liability.[49]  Here, however, *all* of the relevant factors demonstrate that confusion is likely.

### (i)        The Tempur-Pedic Brand is Strong

Strong marks receive wider protection in the likelihood-of-confusion inquiry than weak marks.[50]  Here, the Tempur-Pedic Brand is strong for three separate and independent reasons.

First, it is largely covered by multiple registrations at the USPTO, some of which are incontestable, and therefore are strong as a matter of law.[51]  Thus, the Court need not review the record evidence of mark strength to weigh this factor in Tempur-Pedic's favor.  Second, the Tempur-Pedic Brand is conceptually strong because it is comprised of inherently distinctive indicators of the origin of the goods and services provided under it.  Specifically, the Tempur-Pedic Brand is comprised of fanciful terms and design elements that do not merely describe any information about the nature of Tempur-Pedic's goods.[52]  Third, the Tempur-Pedic Brand is commercially strong because of the extensive promotion of the brand by Tempur-Pedic and the large volume of sales under the brand.  The commercial strength

---

[49] *Univ. of Ga. Athletic Ass'n v. Laite*, 756 F.2d 1535, 1543 (11th Cir. 1985); *Contemporary Restaurant Concepts*, 753 F. Supp. at 1563 ("None of these factors are dispositive, but rather, the court should attach the appropriate weight to each factor when considering the totality of the circumstances.") (citation omitted).

[50] *See Laite*, 756 F.2d at 1540 ("A strong mark . . . is afforded the widest ambit of protection . . . ."); *Contemporary Restaurant Concepts*, 753 F. Supp. at 1563 ("[I]t is well-established that strong marks are entitled to more protection than weak marks.").

[51] *Caliber Auto. Liquidators, Inc. v. Premier Chrysler, Jeep, Dodge, LLC*, 605 F.3d 931, 939 (11th Cir. 2010) (holding that incontestable marks are "presumed to be at least descriptive with secondary meaning, and therefore [] relatively strong mark[s]."); *Dieter v. B & H Indus. of Sw. Fla., Inc.*, 880 F.2d 322, 328-29 (11th Cir. 1989) (same).

[52] *See generally John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 974 (11th Cir. 1983) ("A purely fanciful or arbitrary mark is generally considered strong and is given protection over a wide range of related products and variations in appearance of the mark.") (internal quotation marks omitted)); *Taco Cabana*, 932 F.2d 1113 (combination of restaurant design elements held inherently distinctive).

48684261v.1 / 057740-000014

inquiry turns on such considerations as the plaintiff's promotional expenditures, the volume of sales under the mark, and the number of outlets through which goods are sold under the brand.  Thus, one court in this Circuit has reached a finding of commercial strength based on the following analysis:

> The extent to which the [plaintiff's] mark has been promoted and the length of time it has been in use . . . lend "strength" to the mark.  The evidence showed that the [plaintiff's] trademark enjoys a high degree of customer recognition as a result of (i) the importance of the trademark in [the plaintiff's] marketing efforts, (ii) the large volume of products sold under the mark, and (iii) [the plaintiff's] extensive promotion and advertising of the mark.[53]

Because trademark law protects "a person who . . . establish[es] a substantial market by an expensive advertising campaign and otherwise enjoy[s] an established business identified with the name, slogan or other attribute of good will," this factor weighs in Tempur-Pedic's favor.[54]

### (ii)   Defendants Are Using Confusingly Similar Branding

"[T]he greater the similarity in the design of the trademarks, the greater the likelihood of confusion."[55]  "In determining the degree of similarity . . . the Court must consider the overall impression created by the marks as a whole rather than simply comparing individual features of the marks."[56]  Defendants have used nearly identical reproductions of every

---

[53] *Gold Kist Inc. v. Conagra, Inc.*, 708 F. Supp. 1291, 1297 (N.D. Ga. 1989); *see also E. Remy Martin & Co. v. Shaw-Ross Int'l Imps.*, 756 F.2d 1525, 1533 (11th Cir. 1985) ("[The plaintiff's] marks appear to us to be . . . strong . . . by virtue of long use and extensive promotion.").

[54] *Chem. Corp. of Am. v. Anheuser-Busch, Inc.*, 306 F.2d 433, 437 (5th Cir. 1962).

[55] *Exxon Corp. v. Tex. Motor Exch. of Houston, Inc.*, 628 F.2d 500, 505 (5th Cir. 1980).

[56] *Contemporary Restaurant Concepts*, 753 F. Supp. at 1564; *see also id.* at 1565 (granting summary judgment in part because "[a]lthough the décor and menus for the Defendants' restaurant vary slightly from Plaintiff's restaurants, substantial similarities still remain.").

element of the Tempur-Pedic Brand.[57]  Because under these circumstances, "the trial judge,

by inspection of the trademarks, may himself determine, and must determine, the likelihood

of confusion," a finding of likely confusion is appropriate.[58]  This factor weighs in Tempur-

Pedic's favor.

### (iii)     The Parties' Goods and Services are Competitive

"The greater the similarity between the products and services, the greater the

likelihood of confusion."[59]  Defendants' goods and services are directly competitive with

Tempur-Pedic's, at nearly identical price points.   Consequently, this factor weighs in

Tempur-Pedic's favor.

### (iv)     The Parties Target Identical Customers and Use Similar Channels of Distribution

Similarities in purchasers are probative of likely confusion.[60]  A precise identity of

customers is not required.   Rather, liability may attach if the parties cater "to the same

general kinds of individuals," even if those individuals do not frequent both parties'

businesses.[61]  Here, the parties compete for the same customers in the same channels of

distribution.  This factor weighs in Tempur-Pedic's favor.

---

[57]  Defendants' misappropriation of multiple branding elements owned by Tempur-Pedic is an exacerbating factor weighing in favor of liability.  *See Volkswagenwerk AG v. Rickard*, 492 F.2d 479 (5th Cir. 1974).

[58]  *Beef/Eater Rests. v. James Burrough Ltd.*, 398 F.2d 637, 639 (5th Cir. 1968); *see also Nat'l Ass'n of Blue Shield Plans v. United Bankers Life Ins. Co.*, 362 F.2d 374, 378 (5th Cir. 1966) (finding confusion likely as a matter of law on ground that "[w]e need only . . . to mentally juxtapose the two word-marks as they appear in print . . . to find that confusion is not only likely, but probable").

[59]  *Exxon Corp.*, 628 F.2d at 505.

[60]  *See, e.g., Am. Foods, Inc. v. Golden Flake, Inc.*, 312 F.2d 619, 624 (5th Cir. 1963).

[61]  *Safeway Stores v. Safeway Discount Drugs, Inc.*, 675 F.2d 1160, 1166 (11th Cir. 1982).

### (v)  The Parties' Use Identical Advertising Media

Similarities in advertising media are probative of a likelihood of confusion.[62]  That individual media do not carry both parties' advertisements is irrelevant if their target audiences overlap.[63]  Here, the parties use the same media and promotional strategies to target the same consumers.  Accordingly, this factor weighs in Tempur-Pedic's favor.

### (vi)  Defendants have acted in bad faith

Intentional copying "creates a presumption of likely confusion."[64]  Such bad faith conduct, alone, can justify a finding of infringement.[65]  This rule applies with particular force if a defendant has adopted a mark knowing consumers will associate it with the mark owner.  Under these circumstances, it is apparent the mark is the "triggering mechanism" for sales under it, and confusion is thus inevitable.[66]

This factor strongly indicates a finding of liability.  MF is struggling to stay afloat.  News reports about MF are dominated by reports of its financial woes.  As a former Authorized Retailer, MF is all too aware of the Tempur-Pedic Brand, and the value it brings to its business.  Even Wall Street analysts have discussed the importance of Tempur-Pedic products to MF's financial well-being.[67]  This explains MF's intentional continued use of the Tempur-Pedic Brand after its right to do so expired in April 2017.  This also explains why it

---

[62] *See, e.g., AmBrit Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1542 (11th Cir. 1986); *John H. Harland Co.*, 711 F.2d at 976-77.

[63] *See Safeway*, 675 F.2d at 1166; *Exxon*, 628 F.2d at 506.

[64] *Bauer Lamp Co. v. Shaffer*, 941 F.2d 1165, 1172 (11th Cir. 1991).

[65] *Sun-Fun Prods. v. Suntan Research & Dev.*, 656 F.2d 186, 190 (5th Cir. Unit B 1981); *Contemporary Restaurant Concepts*, 753 F. Supp. at 1565 ("Courts have found evidence of this factor [bad faith] alone to be sufficient to reach a finding of likelihood of confusion.").

[66] *See Boston Prof'l Hockey Ass'n v. Dallas Cap & Emblem Mfg., Inc.*, 510 F.2d 1004, 1012 (5th Cir. 1975); *accord Laite*, 756 F.2d at 1546.

[67] Anderson Dec., Exh. L (Raymond James analyst report).

finally stopped doing so only after a federal judge enjoined MF's conduct in the Texas Action.  It is no wonder that, barely a year after the injunction, MF is back at it.

Nothing but bad faith can explain why MF chose to use, and Therapedic agreed to let MF use, the Therapedic mark in a manner that is confusingly similar to the Tempur-Pedic Mark—a manner in which the Therapedic mark has never before been used.  Nothing but bad faith can explain why MF chose to design, and Sinomax agreed to manufacture, the Therapedic mattresses with all of the exact same elements of the Pro-Adapt Trade Dress. Nothing but bad faith can explain why MF is displaying the Therapedic products in the same manner it formerly displayed the Tempur-Pedic products.  Nothing but bad faith can explain why MF is using all of the same elements in the in-store marketing materials for Therapedic that appeared in the in-store marketing materials MF used for Tempur-Pedic and still appear in the Marketing/Store Display Trade Dress.  MF's copying is so deliberate that even its snowflake design is virtually identical to the one used in Tempur-Pedic's Marketing/Store Display Trade Dress.[68]



The same is true with MF's selected color palate, language choices, poster designs, in-store staging, and all of the other elements copied from Tempur-Pedic and described herein.[69]

---

[68] *Id.* Exh. D, E (photos of Tempur-Pedic Stores and Authorized Retailers), Exh. G (photos of MF locations).
[69] *Id.*

As courts in this District have noted:

> There is no dispute that [Defendants] sought to obtain franchise rights for one of their restaurants . . . . At that time, they were well aware that Plaintiff owned the federally registered service mark for 'Long Horn Steaks.'   Despite being denied franchise rights . . . the Defendants proceeded with plans to open a restaurant . . . called 'Longhorn Steakhouse.'   Apparently by obtaining rights to a Florida service mark with that title, Defendants hoped to add a sense of legitimacy to their planned restaurant.  In reviewing this sequence of events, the inescapable conclusion is that Defendants intended to profit from [Plaintiff's] established reputation …[70]

The same is true here.  Only bad faith explains MF's conduct.  This factor weighs in Tempur-Pedic's favor and is sufficient to issue a preliminary injunction.

### (vii)   Actual Confusion is Inevitable

Evidence of actual confusion is not necessary for preliminary injunctive relief.[71]  And actual confusion is precisely the form of consumer harm that Tempur-Pedic is swiftly seeking to stave off.  For all the reasons already explained in factors i-vi, *supra*,  and in particular Defendants' bad faith, confusion is inevitable.   Even MF's employees have acknowledged the striking similarity of the Therapedic mattresses to the Tempur-Pedic mattresses.[72]  If salespeople and industry analysts think they look similar, typical consumers will as well and be actually confused.[73]  This factor favors Tempur-Pedic and a finding of likelihood of confusion.

---

[70] *Contemporary Restaurant Concepts*, 753 F. Supp. at 1564-65.

[71] *See, e.g.*, *E. Remy Martin*, 756 F.2d at 1529.

[72] Anderson Dec. at ¶ 47, Exh. J (email recounting the present sense impression of an MF employee upon viewing Therapedic mattresses on MF website).

[73] *See Bentley Motors*, 899 F. Supp.2d at 1303 (treating articles discussing the resemblance of Defendant's goods to Plaintiff's goods as evidence of confusion).

21

### B.   TEMPUR-PEDIC IS LIKELY TO PREVAIL ON THE MERITS OF ITS DILUTION CLAIMS

Defendants' conduct is likely to dilute the distinctiveness of the famous Tempur-Pedic Marks.[74]  Under both state and federal law:

> [D]ilution can take two forms.  The first is a "blurring" or "whittling down" of the distinctiveness of a mark.  This can occur where the public sees the mark used widely on all kinds of products.  The second type of dilution is tarnishment which occurs when a defendant uses the same or similar marks in a way that creates an undesirable, unwholesome, or unsavory mental association with the plaintiff's mark.[75]

A mark need only be distinctive to qualify for protection against likely dilution under the laws of a number of states, including some of those forming the basis for Tempur-Pedic's state dilution claims here.[76]  As to those states, the federal registrations covering the Tempur-Pedic Marks satisfies the distinctiveness requirement as a matter of law.[77]

To qualify for protection under the dilution statutes of other states, and the federal dilution statute, in addition to being distinctive, a mark must also be famous.  Under the state statutes, including Florida's, the mark must be famous within the state.[78]  Under the federal statute, it must be famous throughout the U.S.  That is, it must be "widely recognized by the general consuming public of the U.S. as a designation of source of the goods or services."[79] Factors relevant to fame consider the duration, extent and geographic reach of advertising

---

[74] A finding of likely dilution can occur in the absence of likely confusion. *See, e.g.*, *Cmty. Fed. Sav. & Loan Ass'n v. Orondorff*, 678 F.2d 1034 (11th Cir. 1982).

[75] *Original Appalachian Artworks, Inc. v. Topps Chewing Gum, Inc.*, 642 F. Supp. 1031, 1039 (N.D. Ga. 1986) (citing McCarthy, TRADEMARKS AND UNFAIR COMPETITION); *see also* 15 U.S.C. § 1125(c)(1) (prohibiting likely dilution by blurring and likely dilution by tarnishment).

[76] *See, e.g.*, O.C.G.A. § 10-1-451(b) (Georgia's anti-dilution statute).

[77] *See Burke-Parsons-Bowlby*, 871 F.2d at 593 (incontestable registrations are conclusive evidence of distinctiveness)

[78] *See* FLA. STAT. § 495.151 ("The owner of a mark that is famous in this state . . . .").

[79] 15 U.S.C. § 1125(c)(2)(A).

featuring the mark, sales under it, consumers' recognition of it, and the registrations covering it.[80]  As explained here, these factors easily support the fame of the Tempur-Pedic Marks.

As for whether dilution is likely, as the Supreme Court explains, "direct evidence of dilution…will not be necessary if actual dilution can reliably be proven through circumstantial evidence—the obvious case is one where the junior and senior marks are identical."[81]  Likelihood of confusion also provides probative evidence of a likelihood of dilution.[82]

Here, likely dilution by blurring (*i.e.*, the whittling down of distinctiveness) is clearly established by (1) Defendants' use of marks nearly identical to the Tempur-Pedic Marks, and (2) the already established likelihood of confusion.  Dilution by tarnishment (*i.e.*, causing an undesirable association) is similarly likely to arise from Defendants' seemingly much lower quality mattresses.  Tempur-Pedic, therefore, is likely to prevail on its dilution claims.

### C.   DEFENDANTS' ACTIONS ARE CAUSING IRREPARABLE HARM TO TEMPUR-PEDIC

Tempur-Pedic is being irreparably harmed by the confusion that Defendants are causing, loss of sales, and loss of goodwill.  The Tempur-Pedic Brand is being irreparably harmed where, by virtue of Defendants' infringement, Tempur-Pedic has lost control of its reputation and customer goodwill because it has no control over the quality of the goods and

---

[80] 15 U.S.C. § 1125(c)(2)(A); *see also* FLA. STAT. § 495.151(1)(a)-(h).

[81] *Moseley v. V. Secret Catalogue, Inc.*, 537 U.S. 418, 434 (2003); *see also Nike Inc. v. Variety Wholesalers, Inc.*, 274 F. Supp. 2d 1352, 1372 (S.D. Ga. 2003) (entering summary judgment of actual dilution "due to the identical or virtually identical character of the marks on the Accused Goods to the [plaintiff's] trademarks").

[82] *James Burrough, Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 274-75 n.16 (7th Cir. 1976) ("A trademark likely to confuse is necessarily a trademark likely to dilute.").

services, including the warranty.[83]   As this Court is aware, "[g]rounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill.  Irreparable injury can also be based upon the possibility of confusion."[84]   Additionally, as Tempur-Pedic has already learned through experience, MF will not stop infringing the Tempur-Pedic Brand unless it is first enjoined by a court.  Thus, Tempur-Pedic has no adequate remedy to prevent the damages it will suffer if infringement is allowed to continue.[85]   This factor, therefore, weighs in favor of injunctive relief pending the Court's disposition of this litigation on the merits.

### D.   THE BALANCE OF HARDSHIPS WARRANTS ENTRY OF A PRELIMINARY INJUNCTION

Tempur-Pedic is suffering and will continue to suffer diversion of customers, loss of the ability to control its reputation, and potential injury to the valuable Tempur-Pedic Brand. In contrast, Defendants have no legally protectable interests in continuing to misappropriate the Tempur-Pedic Brand and otherwise to trade on the goodwill of Tempur-Pedic: "Advantages built upon a deliberately plagiarized make-up do not . . . give the borrower any standing to complain that his vested interests will be disturbed."[86]   Because MF has pursued

---

[83] Anderson Dec. at ¶ 44.

[84] *Bentley Motors*, 899 F. Supp.2d at 1303 (quoting *Ferrellgas Partners, L.P. v. Barrow,* 143 Fed.Appx. 180, 190 (11th Cir. 2005)).

[85] *See Microsoft Corp. v. Silver Star Micro, Inc.*, No. 1:06-CV-1350-WSD, 2008 WL 11506, at *10 (N.D. Ga. Jan. 9, 2008) ("Plaintiff has established that the Defendants infringed its copyrights and trademarks after being instructed in writing to cease their infringing conduct.  These facts show that Defendants are likely to engage in future wrongful conduct.  Plaintiff does not have an adequate remedy to prevent damage it would suffer by further infringement by Defendants, and entry of a permanent injunction is appropriate.").

[86] *My-T Fine Corp. v. Samuels*, 69 F.2d 76, 77 (2d Cir. 1934) (L. Hand, J.); *see also Windsurfing Int'l, Inc. v. AMF*, 782 F.2d 995, 1003 n.12 (Fed. Cir. 1980) ("One who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected.").

this misconduct after having already been previously enjoined, any harm it may suffer is self-inflicted.

Finally, entry of injunctive relief is unlikely to harm Defendants in light of the relatively short time they currently have been misappropriating the Tempur-Pedic Brand. Indeed, in light of the likelihood that Tempur-Pedic will prevail on the merits, an injunction will benefit all parties.  "[A] preliminary injunctive decree . . . is sometimes an act of kindness to the party enjoined.  It cuts him off from a business life which, from all the portents, would involve a series of trademark frustrations."[87]  Accordingly, this factor also favors entry of the requested relief.

### E.    THE PUBLIC INTEREST WILL BE BEST SERVED BY A PRELIMINARY INJUNCTION

An essential purpose of trademark protection is to protect the consuming public from being misled as to the source of goods.  Indeed, in any trademark case, "the public interest in preventing confusion around the marketplace is paramount." [88]   Consequently, when weighing this factor for purposes of the injunctive-relief inquiry, "[p]reventing confusion in the market place and guaranteeing consumers the product they desire is clearly in the public interest."[89]  Accordingly, like all others, this factor also favors entry of injunctive relief.

### IV.   CONCLUSION

For the reasons set forth above, Tempur-Pedic respectfully requests that the Court grant its motion in its entirety.

---

[87] *E. Remy Martin*, 756 F.2d at 1534 (citation omitted).

[88] *Coach House Rest., Inc. v. Coach & Six Rests., Inc.*, 934 F.2d 1551, 1564 (11th Cir. 1991).

[89] *Schmidt v. Honeysweet Hams, Inc.*, 656 F. Supp. 92, 97 (N.D. Ga. 1986).

Dated:  August 28, 2018                    Respectfully submitted,

*s/ Suzanne Barto Hill*
SUZANNE BARTO HILL, ESQUIRE
Florida Bar No. 0846694
E-mail:  shill@rumberger.com (primary)
        docketingorlando@rumberger.com and
        shillsecy@rumberger.com (secondary)
RUMBERGER, KIRK & CALDWELL
A Professional Association
Lincoln Plaza, Suite 1400
300 South Orange Avenue (32801)
Post Office Box 1873
Orlando, Florida  32802-1873
Telephone:  (407) 872-7300
Telecopier:  (407) 841-2133

SARA S. WHITEHEAD, ESQUIRE
Florida Bar No. 0099218
E-mail:  swhitehead@rumberger.com
        swhiteheadsecy@rumberger.com;
        docketingtpa@rumberger.com (secondary)
RUMBERGER, KIRK & CALDWELL, P.A.
A Professional Association
100 North Tampa Street, Suite 2000
Post Office Box 3390
Tampa, Florida  33601-3390
Telephone:  (813) 223-4253
Telecopier:  (813) 221-4752
EDWARD F. MALUF, ESQUIRE
(*pro hac vice* admission pending)
JEREMY A. SCHACHTER, ESQUIRE
(*pro hac vice* admission pending)
Email:  jschachter@seyfarth.com
Email:  emaluf@seyfarth.com
SEYFARTH SHAW LLP
620 Eighth Avenue
New York, New York 10018
Telephone:  (212) 218-5500

*Attorneys for Plaintiffs*