UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


TEMPUR-PEDIC NORTH AMERICA,
LLC, TEMPUR-PEDIC MANAGEMENT,
LLC, and DAN-FOAM APS,

       Plaintiffs,

v.                                      Case No. 8:18-cv-2147-T-33SPF

MATTRESS FIRM, INC.,
THER-A-PEDIC ASSOCIATES, INC.,
SINOMAX GROUP LIMITED, and
SINOMAX USA INC.,

       Defendants.
_____/


## REPORT AND RECOMMENDATION

      This matter comes before the Court upon plaintiffs Tempur-Pedic North America, LLC ("Tempur-Pedic"), Tempur-Pedic Management, LLC ("TPM"), and Dan-Foam ApS' ("Dan-Foam") (collectively "Plaintiffs") Motion for a Preliminary Injunction (Doc. 8) and Defendants Mattress Firm, Inc. ("Mattress Firm"), Ther-A-Pedic Associates, Inc. ("Therapedic"), Sinomax Group Limited, and Sinomax USA Inc. ("Sinomax") (collectively "Defendants") responses in opposition thereto (Docs. 44, 45, 61).  For the reasons that follow, it is recommended that Plaintiffs' Motion for a Preliminary Injunction (Doc. 8) be DENIED.

# PROCEDURAL BACKGROUND

This matter arises out of the termination of a twenty-year business relationship between Tempur-Pedic and Mattress Firm.  Essentially, Tempur-Pedic claims that with its "Therapedic Premier" line of mattresses, Mattress Firm and its associates—trademark licensor, Therapedic, and mattress manufacturer, Sinomax—are infringing in "the overall look and feel" of the Tempur-Pedic Trade Dress (Doc. 9 at 6).  As a result, Plaintiffs filed the instant lawsuit against Defendants alleging Trademark and Trade Dress infringement under 15 U.S.C § 1114, Trademark Dilution under 15 U.S.C § 1125(c), Unfair Competition under 15 U.S.C § 1125(a), Common Law Trademark Infringement, and violations of the unfair and deceptive trade practices and anti-dilutions laws of different states[1] (Doc. 1).  Concurrently with their original Complaint, Plaintiffs filed the instant Motion for a Preliminary Injunction ("Motion") (Doc. 8).  Following the denial of the Motion for Temporary Restraining Order, the District Judge referred the Motion to the undersigned for a hearing and the issuance of a report and recommendation (Doc. 12).  On September 25, 2018, the Court held a hearing on the Motion (Doc. 84).  In accordance with Local Rule 4.06(b), the hearing was limited to the arguments of the attorneys, but the parties were allowed to supplement their briefs with evidence for the Court's consideration (Doc. 66).  The parties filed their supplemental evidence (Doc. 71, 72, 73, 76, 79, 81).[2]  While Plaintiffs initially sought the preliminary injunction on several grounds, Plaintiffs announced at the hearing that they sought an injunction on the sole basis of Defendants' alleged infringement of the

---

[1] Including Florida, California, Colorado, Georgia, Hawaii, Illinois, Maine, Minnesota, Nebraska, New Mexico, New York, Ohio, and Oklahoma, among others.

[2] Plaintiffs moved to strike Defendant Mattress Firm's filing at Doc. 72.  Subsequently, Mattress Firm moved to withdraw its filing (Doc. 87), and the Court denied Plaintiffs' motion to strike as moot (Doc. 88).

Tempur-Pedic Trade Dress.   After the hearing, Mattress Firm filed a Suggestion of

Bankruptcy (Doc. 93), and the District Judge closed the case administratively (Doc. 94).   On

November 27, 2018, following an order by the bankruptcy court, the District Judge reopened

the case (Doc. 98).   Mattress Firm then filed a supplemental response to Plaintiffs' Motion for

a Preliminary Injunction, and Plaintiffs filed a reply (Doc. 106 & 113).[3]   In the interim,

Plaintiffs filed an Amended Complaint but did not amend their Motion (Doc. 109).   By their

Motion and oral arguments, Plaintiffs seek to prevent Defendants from using the "overall

look and feel" of the Tempur-Pedic Trade Dress in connection with the sale, offering for sale,

distribution, promotion, or advertisement of mattresses or other bedding products (Doc. 8 at

4–5).

## FACTUAL BACKGROUND

On January 1, 2014, Tempur-Pedic and Mattress Firm entered into a Master Retailer

Agreement giving Mattress Firm the right to sell Tempur-Pedic products and to use the

Tempur-Pedic mark in connection with the retailing of Tempur-Pedic products (Anderson

Decl., Doc. 10, ¶¶ 29-31; Doc. 31, ¶40).   The Master Retail Agreement was terminated by the

parties on April 3, 2017.   From that point on, Mattress Firm was prevented from selling

Tempur-Pedic products, except for those in Mattress Firm's inventory, or use the Tempur-

Pedic brand in connection with its retailing business (Anderson Decl., Doc. 10, ¶35; Doc. 1

at 11; Doc. 45, Ex. 10 at 2).   Following the breakup between the parties, Tempur-Pedic

---

[3] In its supplemental response Mattress Firm addressed various changes being introduced to the presentation of its Therapedic Premier line of mattresses.   Specifically, Mattress Firm argues that changes to the trademark style and split-screen posters used by Mattress Firm make Plaintiffs' Motion moot and injunctive relief unjustified in this case (Doc. 106 at 4–5). Upon review, the Court finds that these changes have no specific bearing on Plaintiffs' Motion because they are not being implemented in the Florida market until March 2019. Consequently, Plaintiffs' Motion is not moot.

introduced its Pro-Adapt line of mattresses at a trade show in Las Vegas and offered it to the public around May 2018. (Stagner's Decl., Doc. 45-1, ¶9).

Tempur-Pedic alleges common law trade dress rights in its Pro-Adapt mattress design, which consists of the following elements: (i) a black/charcoal gray mattress; (ii) a white mattress cover with colored grooves/ridges and colored trim; and (iii) the TEMPUR-PEDIC word mark in white, block letters at the left foot of the mattress (collectively the "Pro-Adapt Trade Dress"). (Anderson Decl., Doc. 10, ¶¶13, 15). Tempur-Pedic also alleges that it owns federal registrations for other elements of its mattress design. Specifically, the diagonal slants at the corners of the white mattress covers together with specific colored trims (collectively the "Registered Trade Dress"). Finally, Tempur-Pedic alleges ownership of common law trade dress rights in its store display, which consists of the following elements: (i) Tempur-Pedic mattresses reflecting one or more of the Tempur-Pedic Marks at the left foot of the mattress; (ii) the Registered Trade Dress; (iii) a cloth "runner" or foot protector along the foot of the mattress; (iv) a product description with similar typeface and sizing on the left side of the runner; (v) split-screen posters reflecting the Tempur-Pedic Marks and images of a model or models; and (vi) use of a snowflake design (collectively the "Marketing/Store Display Trade Dress"). (Anderson Decl., Doc. 10, ¶23). The Pro-Adapt Trade Dress, the Registered Trade Dress, and the Marketing/Store Display Trade Dress are collectively referred to by Tempur-Pedic as the "Tempur-Pedic Trade Dress."

In August 2018, after obtaining a license to use Therapedic's registered trademark and its derivative forms in connection with the manufacture and sale of mattresses and other bedding products (Doc. 1 at 12; Doc. 45, Ex. 6), Mattress Firm introduced to the Florida market its "Therapedic Premier" line of mattresses. The Therapedic Premier mattresses and

its market display feature elements in common with the Tempur-Pedic Trade Dress. Notably, a black and white mattress with colored trims displaying a white trademark at the left side of the mattress; a foot cover displaying information about the mattress; split-screen posters with images of models, and a snowflake image. As discussed above, Plaintiffs seek to enjoin Defendants from advertising and selling the Therapedic Premier line of mattresses arguing that the Therapedic Premier line is infringing upon the Tempur-Pedic Trade Dress. (Doc. 84 at Tr. 96:7-11).

## DISCUSSION

Parties seeking a preliminary injunction bear the burden of establishing their entitlement to relief. *Scott v. Roberts*, 612 F.3d 1279, 1290 (11th Cir. 2010). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). "A district court may grant injunctive relief if the movant shows the following: (1) substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998). "A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the 'burden of persuasion' as to the four requisites." *All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc.*, 887 F.2d 1535, 1537 (11th Cir. 1989). If a party establishes the right to a preliminary injunction, its scope "must be 'narrowly tailored to fit specific legal violations, because the district court should not impose unnecessary burdens on lawful

activity.'" *Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.*, 304 F.3d 1167, 1178 (11th Cir. 2002) (citing *Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 299 (2d Cir. 1999)).

## I.   Likelihood of Success on the Merits

Plaintiffs move for a preliminary injunction on the sole basis that the Therapedic Premier product and marketing infringe on the Tempur-Pedic Trade Dress.  (Doc. 84 at Tr. 23:25-24:6;  47:15-20;  and 99:18-100:13).  Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), creates a federal cause of action for trade dress infringement. *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1535 (11th Cir. 1986).  Trade dress generally refers to the appearance of a product when that appearance is used to identify the producer.  *Dippin' Dots, Inc. v. Frosty Bites Distrib., LLC*, 369 F.3d 1197, 1202 (11th Cir. 2004) (citing *Publ'ns Int'l, Ltd. v. Landoll, Inc.*, 164 F.3d 337, 338 (7th Cir. 1998)).  "Trade dress is a complex composite of features and the law of unfair competition in respect to trade dress requires that all of the features be considered together, not separately." *Miller's Ale H., Inc. v. Boynton Carolina Ale H., LLC*, 702 F.3d 1312, 1322 (11th Cir. 2012) (citing *Am. Greetings Corp. v. Dan–Dee Imports, Inc.,* 807 F.2d 1136, 1141 (3d Cir. 1986)).  Trade dress comprises the total image of a product and may include features such as size, shape, color, texture, and graphics. *Dippin' Dots, Inc.*, 369 F.3d at 1202 (citations omitted).  Additionally, a trade dress infringement action "may 'extend to marketing techniques' and can include certain 'sales technique[s] designed to make the product readily identifiable to consumers and unique in the marketplace.'" *Hyman v. Nationwide Mut. Fire Ins. Co.*, 304 F.3d 1179, 1189 (11th Cir. 2002) (citing *Original Appalachian Artworks, Inc. v. Toy Loft, Inc.,* 684 F.2d 821, 831 (11th Cir. 1982)).

Tempur-Pedic asserts trade dress rights over the "overall look and feel" of its Pro-Adapt line of mattresses and in-store marketing.  Specifically, Tempur-Pedic claims trade dress protection over a combination of <u>all</u> of the following:

1. TEMPUR-PEDIC word mark in white, block letters at the left foot of the mattress;

2. Black or charcoal grey mattress;

3. White mattress cover with colored grooves/ridges;

4. Diagonal slant colored trim and zipper separating the mattress from the cover;

5. A cloth runner or foot protector along the foot of the mattress;

6. Gallery style store presentation;

7. Split screen posters reflecting the Tempur-Pedic marks and images of a model or models using the product; and

8. Use of a snow flake design.

(Anderson Decl., Doc. 10, ¶24). [4]

To prevail on a claim for trade dress infringement under the Lanham Act, Plaintiffs must prove that: (1) the design of the Tempur-Pedic Trade Dress is inherently distinctive or has acquired secondary meaning; (2) the features of the Tempur-Pedic Trade Dress are primarily non-functional; and (3) the overall look and feel of the two lines of mattresses—Pro-

---

[4] Different from Plaintiffs' original Complaint, Plaintiffs' Amended Complaint breaks down the Defendants' alleged infringement of the "Tempur-Pedic Trade Dress" in three different Counts—(i) infringement of the Pro-Adapt Trade Dress against all Defendants, (ii) infringement of the Registered Trade Dress against all Defendants, and (iii) infringement of the Store Display Trade Dress against Mattress Firm and Therapedic (Doc 109 at 26–30). However, Plaintiffs have not amended their Motion (or withdrawn arguments made during the hearing), which asks the Court to enjoin Defendants from infringing upon the Tempur-Pedic Trade Dress considered as a whole.  Nevertheless, the Court would reach the same conclusion if it considered the Pro-Adapt Trade Dress, Registered Trade Dress, and Marketing/Store Display Trade Dress separately.

Adapt and Therapedic Premier—is confusingly similar. *See Dippin' Dots Inc.*, 369 F.3d at 1202. "[A]s all three elements are necessary for a finding of trade dress infringement, any one could be characterized as threshold." *Id.* (citing *Epic Metals Corp. v. Souliere*, 99 F.3d 1034, 1039 (11th Cir. 1996)). Therefore, a finding by the Court that Plaintiffs have not met the threshold in any one of these prongs will support a recommendation of denial of a preliminary injunction in this case.

### A. *Distinctiveness of Tempur-Pedic's Claimed Trade Dress*

A trade dress is distinctive and capable of being protected if it is either (1) inherently distinctive or (2) has acquired distinctiveness through secondary meaning. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992) (citation omitted). Here, Plaintiffs argue that the Tempur-Pedic Trade Dress is inherently distinctive.

### 1. Inherently Distinctive

A trade dress is inherently distinctive when its "intrinsic nature serves to identify a particular source of a product." *Miller's Ale H., Inc.*, 702 F.3d at 1322; *Two Pesos, Inc.*, 505 U.S. at 771; *AmBrit, Inc.*, 812 F.2d at 1536. A trade dress that is inherently distinctive does not require proof of secondary meaning to be protected. *Two Pesos, Inc.*, 505 U.S. at 776. In assessing the inherent distinctiveness of a trade dress, the Eleventh Circuit has considered some of the following factors: "whether [the trade dress is] a 'common' basic shape or design, whether it [is] unique or unusual in a particular field, and whether it [is] a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods viewed by the public as a dress or ornamentation for the goods." *AmBrit, Inc.*, 812 F.2d at 1536 (citing *Brooks Shoe Mfg. Co. v. Suave Shoe Corp.*, 716 F.2d 854 (11th Cir. 1983)); *Miller's*

*Ale H., Inc.*, 702 F.3d at 1323 (reaffirming the use of these factors in the Eleventh Circuit to determine whether a trade dress is distinctive).

The question, therefore, is whether the overall look and feel of the Tempur-Pedic Trade Dress, as described by Plaintiffs, serves to tell a customer that the product in display is a Tempur-Pedic mattress, rather than to tell a customer that the product in display is a mattress from any other company. In other words, whether the overall look and feel of Plaintiffs' trade dress is distinctively of Tempur-Pedic. *See In Re Hudson News Co.*, 39 U.S.P.Q.2d 1915 (Trademark Tr. & App. Bd. Aug. 7, 1996) (denying a trade dress registration for the overall look and feel of a store because the proposed trade dress did not automatically tell customers that it refers to a specific source; rather, the overall look and feel merely told customers that the store had an interior decor with features generally found in retail stores, such as lighting, carpeting, and display racks). If a trade dress is not inherently distinctive, it is unfair to others in the industry to allow its appropriation absent a showing of secondary meaning. *In re Chippendales USA, Inc.*, 662 F.3d 1346, 1352 (Fed. Cir. 2010).

Here, the Tempur-Pedic Trade Dress cannot be characterized as unique or unusual in the field. A review of the evidence in the record shows that different mattress companies, including the parties, use similar elements individually and in composition to display and sell their mattresses. For example, black and charcoal gray mattresses with white tops are common in the bedding industry, including brands such as "Serta, Simmons, Comfort Pedic, Puffy, Tulo, Sierra Sleep, and Casper." (*See* Stagner's Decl., Doc. 45-1, ¶10). Additionally, the combination of the black and white mattress with a colored trim is not unique to the Tempur-Pedic Pro-Adapt line. Indeed, Mattress Firm's "Dream Bed Lux" and "Tulo" mattresses, introduced to the market by Mattress Firm in 2017, included colored seams

dividing the white cover and darker bottom of the mattresses in a way that is similar to the subsequently offered Pro-Adapt line.  (*See* Stagner's Decl., Doc. 45-1, ¶10).  Likewise, the use of split-screen posters reflecting the mattresses' trademark, the use of a "runner" or foot cover at the foot of the mattress, and the placement of the logo in the left side of the mattress, appear to be elements widely used in the mattress industry because they serve specific functions.

More importantly, however, the display of the sum of these elements appears to be, if not the standard, a common presentation of mattresses in showrooms and retailing spaces. (*See id*.); *Miller's Ale H., Inc.*, 702 F.3d at 1324 (finding nothing particularly unique about a group of features used in the decor of a restaurant because those features were prototypical of a standard sports bar).  For example, nothing in the record suggests that the concept of gallerization used by Mattress Firm to showcase the Tempur-Pedic's mattresses was intended to specifically link this display style to the Tempur-Pedic brand.  Rather, it appears the gallery style is used to "group products from each manufacturer/brand nearby" or to simply showcase a high-end line of mattresses, as Mattress Firm is currently doing with the Therapedic Premier line (*See* Raymond James Report, Doc. 10-13 at 2–4).

Further, the Court finds that the "overall look and feel" of the Tempur-Pedic Trade Dress is merely a refinement of commonly-adopted and well-known practices of mattress retailers to display their products.  In other words, Tempur-Pedic's Pro-Adapt line is arguably a more refined variant of a type of trade dress used by different mattress companies to showcase their products.  *See In re Chippendales USA, Inc.*, 662 F.3d at 1356 (finding that the Cuff & Collar mark used by Chippendales' dancers was not inherently distinctive because "it is a mere variant of a particular costume").  As a result, the Tempur-Pedic Trade Dress is not inherently distinctive.

## 2. Secondary Meaning

Having found that the Tempur-Pedic Trade Dress is not inherently distinctive, the Court must now determine whether the trade dress has acquired a secondary meaning. "A name [or trade dress] has acquired secondary meaning when the primary significance of the term in the minds of the [consuming] public is not the product but the producer." *Welding Services, Inc. v. Forman*, 509 F.3d 1351, 1358 (11th Cir. 2007). The party seeking trademark protection must demonstrate that its trade dress acquired secondary meaning before the alleged infringer first began using its trade dress. *See Gift of Learning Found., Inc. v. TGC, Inc.*, 329 F.3d 792, 800 (11th Cir. 2003). The determination of whether a mark has acquired secondary meaning depends on the "length and nature of the name's use, the nature and extent of advertising and promotion of the name, the efforts of the proprietor to promote a conscious connection between the name and the business, and the degree of actual recognition by the public that the name designates the proprietor's product or service." *Knights Armament Co. v. Optical Sys. Tech., Inc.*, 654 F.3d 1179, 1188 (11th Cir. 2011).

The evidence presented to the Court does not support a finding that the Tempur-Pedic Trade Dress acquired secondary meaning. Tempur-Pedic's Pro-Adapt line of mattresses was in the market for only a short period of time before Mattress Firm launched its Therapedic Premier line. The Pro-Adapt line was first launched in Las Vegas in January 2017, but it was only introduced in the market around May 2018. (Stagner's Decl., Doc. 45-1, ¶9). This factor, therefore, weighs against Plaintiffs.

Second, the nature and extent of Tempur-Pedic's efforts to advertise and promote the Tempur-Pedic's Pro-Adapt line has not been established. According to the declaration of Richard W. Anderson ("Anderson"), Tempur Sealy International, Inc.'s Executive Vice

President of North America, Tempur-Pedic has spent and continues to spend considerable sums of money advertising the Tempur-Pedic Brand in North America, including a total of $61,000,000 on direct advertising in the year 2016 (Anderson Decl., Doc 10, ¶28). Plaintiffs did not show how the marketing effort directly related to the Pro-Adapt line and whether that effort incorporates all the components of the Tempur-Pedic Trade Dress.[5] (*See* Doc. 10-3, ¶5 & Doc. 71-1 at 13, featuring Tempur-Pedic Pro-Adapt mattresses without all of the alleged trade dress components); *cf. Callaway Golf Co. v. Golf Clean, Inc.,* 915 F. Supp. 1206, 1213 (M.D. Fla. 1995) (finding that a trade dress on a line of golf clubs had acquired secondary meaning when the owner of the trade dress "ha[d] bombarded the . . . consumer with the image" of the specific line of clubs and had prominently featured the line in the company's ads to emphasize the line unique and distinctive appearance). With respect to the efforts aimed to promote a conscious connection between the trade dress and the business, it is undeniable that Tempur-Pedic is a recognized brand in the market and its products are widely known. However, Plaintiffs have not presented evidence in the form of a consumer survey, or other similar form, showing that customers connect the combination of elements described as the Tempur-Pedic Trade Dress to Tempur-Pedic.[6] For those reasons, Plaintiffs have failed to establish that the Tempur-Pedic Trade Dress has acquired secondary meaning.

---

[5] For example, an advertisement consisting of pictures of the Pro-Adapt mattress may not include the in-store display elements of the Tempur-Pedic Trade Dress.

[6] In their motion, Plaintiffs argue that the Tempur-Pedic Trade Dress "instantly calls Tempur-Pedic to the consumer's mind." (Doc. 9 at 6). Tempur-Pedic supports its argument with Anderson's declaration. A review of the declaration, however, shows that some of the statements related to the recognition of the Tempur-Pedic's brand by the consumers are unsupported or self-serving; therefore, it is not material evidence supporting a finding of secondary meaning in this case. *See Tana v. Dantanna's*, 611 F.3d 767, 777 (11th Cir. 2010) (finding that affidavits containing self-serving statements regarding the reputation of a plaintiff's mark are not material evidence to a secondary-meaning inquiry).

### B. *Functionality*

The Court must determine whether the Tempur-Pedic Trade Dress is functional.  The

Supreme Court has explained that, "in general terms, a product feature is functional, and

cannot serve as a trademark, if it is essential to the use or purpose of the article or if it affects

the cost or quality of the article, that is, if exclusive use of the feature would put competitors

at a significant non-reputation-related disadvantage."  *Qualitex Co. v. Jacobson Prod. Co.*, 514

U.S. 159, 165 (1995) (internal quotations omitted).  "The functionality doctrine prevents

trademark law, which seeks to promote competition by protecting a firm's reputation, from

instead inhibiting legitimate competition by allowing a producer to control a useful product

feature." *Id*.  "The line between functionality and non-functionality is not brightly drawn."

*Dippin' Dots, Inc.*, 369 F.3d at 1203.

Two tests exist for determining functionality, the traditional test and the competitive

necessity test.  *Id*.  Under the traditional test, "'a product feature is functional . . . if it is

essential to the use or purpose of the article or if it affects the cost or quality of the article.'"

*TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 32 (2001) (quoting *Qualitex*, 514

U.S. at 165).  Under the competitive necessity test, "a functional feature is one the 'exclusive

use of [which] would put competitors at a significant non-reputation-related disadvantage.'"

*Id.* (quoting *Qualitex*, 514 U.S. at 165).  Where the design is functional under the traditional

test, "there is no need to proceed further to consider if there is a competitive necessity for the

feature." *Id*. at 33.

Certain aspects of the Tempur-Pedic Trade Dress are clearly functional.  For example,

the cloth runner protects the mattresses from being damaged by consumers while in display

(Sherrick Decl., Doc. 45-2, ¶4; Stagner Decl., Doc. 45-1, ¶¶5–7).  The Court, however, must

consider the totality of the trade dress features.  *See Dippin' Dots, Inc.*, 369 F.3d at 1203.

Overall, the Court finds the Tempur-Pedic Trade Dress is primarily non-functional.  Notably,

some of the functional elements in the trade dress have been modified in a way that extend

their use in a non-functional manner.  For example, the cloth runner serves as a background

display for information about the mattress, which can hardly be characterized as an essential

function of the runner.  More importantly, however, the specific configuration of the Tempur-

Pedic Trade Dress, while perhaps descriptive of the elements and characteristics of the

mattress, does not appear to be essential to convey the use or purpose of a Pro-Adapt mattress.

In fact, the record shows that some stores, including Tempur-Pedic's online store, displayed

only certain elements of the Tempur-Pedic Trade Dress without affecting the price or quality

of the mattresses.  (*See* Doc. 73-2 at 4; Doc. 10-3 at 5 & 6).   This evidence supports a finding

that the trade dress as a whole is not a functional requirement of Tempur-Pedic's Pro-Adapt

line.

Similarly, the Court finds that the Tempur-Pedic Trade Dress is non-functional under

the competitive necessity test.  In *Qualitex Co.*, the Supreme Court discussed the competitive

necessity test in terms of "aesthetic functionality." 514 U.S. at 170.  The Court explains that

if a design's aesthetic value provides a product with such benefit that it cannot be replicated

by using an alternative design then the design is functional.  *Id.* (citing the Restatement (Third)

of Unfair Competition § 17, cmt. c. 00. 175–176 (1993)).  "'The ultimate test of aesthetic

functionality' . . . 'is whether the recognition of [trade dress] rights would significantly hinder

competition.'" *Id.*

Here, there is no evidence that offering protection to the Tempur-Pedic Trade Dress

would eliminate all competitors in the luxury foam market. *Cf. Dippin' Dots, Inc.,* 369 F.3d at

1204, n. 7 (stating "the color, shape, and size of dippin' dots are 'aesthetic functions' . . . because precluding competitors . . . from copying any of these aspects of dippin' dots would eliminate all competitors in the flash-frozen ice cream market, which would be the ultimate non-reputation-related disadvantage"). In fact, even if Tempur-Pedic's competitors were prohibited from using some of the elements of the Tempur-Pedic Trade Dress—a foot protector displaying information about the mattress or a split-screen panel featuring the product—nothing in the record supports an argument that other luxury foam mattress companies would be prevented from selling their products in a competitive way. Consequently, the Court finds that the Tempur-Pedic Trade Dress is non-functional.

### C. Likelihood of Confusion

In determining the likelihood of confusion, courts should consider: "(1) the strength of [a] plaintiff's trade dress, (2) the similarity of the products' designs, (3) the similarity of the products themselves, (4) the similarity of the parties' trade channels and customers, (5) the similarity of advertising media used by the parties, (6) the defendant's intent, and (7) the existence and extent of actual confusion in the consuming public." *Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 898 F.3d 1279, 1289 (11th Cir. 2018); *see Fla. Int'l Univ. Bd. of Trustees v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1255 (11th Cir. 2016). This determination is not made "by merely analyzing whether a majority of the subsidiary factors indicates that such a likelihood exists." *AmBrit, Inc.*, 812 F.2d at 1538. Rather, a court is to "apply the factors holistically." *Yellowfin Yachts*, 898 F.3d at 1289. The most important factor in this analysis, however, is the extent of actual confusion followed by the strength of the trade dress. *Id.*; *Fla. Int'l*, 830 F.3d at 1264. "Those factors have the strongest influence on the question the test

was created to assess: the likelihood of consumer confusion." *Yellowfin Yachts*, 898 F.3d at 1289.

With respect to the factors, three are generally not in dispute. Mattress Firm concedes,[7] as it must, that the Tempur-Pedic's Pro-Adapt line and Mattress Firm's Therapedic Premier line are similar products. (Doc. 84, Tr. 63:20–64:21). Indeed, the reason Mattress Firm developed the Therapedic Premier line was to compete in the high-end foam mattress niche market. (Doc. 84, Tr. 55:2–5; 64:11–21). Because the products operate in the same niche market, they cater to the same customers seeking a high-end, expensive foam mattress. Both the Pro-Adapt line and the Therapedic Premier line are sold through similar sales methods (*i.e.,* both online and in brick and mortar stores), though not in the same stores. (Doc. 84, Tr. 64:22–65:7). Finally, both products are sold using generally the same marketing methods. (Doc. 84, Tr. 66:8–11). As a result, the Court finds that each of these three factors weigh in favor of Plaintiffs. The Court now turns to the remaining factors.

1. <u>Strength of Trade Dress</u>

The strength of the trade dress determines the scope of protection it will receive. *See AmBrit, Inc.*, 812 F.2d at 1539. "Strong trade dress receives strong protection, and weak trade dress receives weak protection." *Id.* The strength of a trade dress is determined by a number of factors that establish its standing in the marketplace. *Id.* Notably, these factors include the type of trade dress and the degree to which third parties make use of the trade dress. *Vital Pharm., Inc. v. Am. Body Bldg. Prods., LLC.*, 511 F. Supp. 2d 1303, 1315 (S.D. Fla. 2007). In determining the type of trade dress, the Court is required to analyze "the degree of

---

[7] Even without Mattress Firm's concessions, the Court specifically finds that each of these three factors weigh in favor of Plaintiffs.

distinctiveness of [the] trade dress." *AmBrit, Inc.*, 812 F.2d at 1539 n. 38.  In other words, the Court must determine whether the trade dress is generic, descriptive, suggestive, arbitrary, or fanciful.  *Id.* at 1539.

The Court finds that the Tempur-Pedic Trade Dress can be characterized, at best, as a descriptive trade dress not subject to protection.  The Tempur-Pedic Trade Dress is a combination of elements common in the marketplace and, therefore, generically expected by customers.  *See Kohler Co. v. Titon Indus., Inc.*, No. CIV.A. 1:97CV428 RWS, 1999 WL 1043221, at *3 (N.D. Ga. Mar. 26, 1999) (finding a latrine trade dress generic as its design did not drastically depart from the basic tank and bowl required for an operable latrine).

Some of these elements, however, were modified to describe the characteristics and qualities of the Pro-Adapt line and provide the customers with information regarding the mattresses.  For example, the foot cover not only serves as a protection for the mattress, but it is used as a display of information describing the firmness, temperature, and comfort level of the mattresses to the consumers.  Similarly, the split-screen panels are used to picture the mattresses as a way to describe the offered product.  (*See* Doc. 10-8 at 2 & 6); J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 11:16.50 (5th ed. 2017) (explaining that "a picture that is merely a representation of the goods themselves is regarded as merely descriptive of the goods").  Overall, the presence of these elements elevates the Tempur-Pedic Trade Dress from a generic trade dress to a descriptive one.  *See Vraiment Hosp., LLC v. Binkowski*, No. 8:11-CV-1240-T-33TGW, 2012 WL 1493737, at *8 (M.D. Fla. Mar. 19, 2012), *report and recommendation adopted*, 2012 WL 1470309 (M.D. Fla. Apr. 27, 2012) ("[a] descriptive trade dress describes a characteristic or quality of the product or service, such as its intended use, its ingredients, its dimensions, its desirable features, or its end effect on

the consumer"). At the same time, the presence of these elements prevents consumers from using their imagination to determine the nature of the service or product, as is the case with suggestive trade dresses. *AmBrit, Inc.*, 812 F.2d at 1537. Therefore, the Court concludes that the Tempur-Pedic Trade Dress can be characterized as a descriptive trade dress.

A descriptive trade dress is only subject to protection when it has acquired a secondary meaning. *See Two Pesos, Inc.*, 505 U.S. at 769 (stating that if a trade dress is descriptive, it is protectable only upon a showing of secondary meaning). Because the Court previously found that the Tempur-Pedic Trade Dress failed to acquire a secondary meaning, the trade dress is not strong enough to warrant protection. *See Atlanta Allergy & Asthma Clinic, P.A. v. Allergy & Asthma of Atlanta, LLC*, 685 F. Supp. 2d 1360, 1377 (N.D. Ga. 2010). Therefore, this factor weighs in favor of Defendants.[8]

   2.   Similarity of Designs

The similarity of design test has been described as "really nothing more than a subjective eyeball test." *AmBrit, Inc.*, 812 F.2d at 1540 (internal quotation omitted). A side by side comparison between the Pro-Adapt line and the Therapedic Premier line shows a similar design to both. The trade dresses have the same compounding elements, including a mattress with a black bottom and white top, colored seams dividing the white and dark bottom of the mattress, split-screen posters reflecting the mattress trademark, a cloth runner at the foot of the mattress, the placement of the trademark in white letters on the left side of the mattress, and overall similar color schemes (*Compare* Doc. 73-3 at 5 *with* Doc. 10-5 at 2).[9]   Therefore,

---

[8] While the Court acknowledges Plaintiffs' argument that the Tempur-Pedic's trademark is a famous mark subject to strong protection, the specific inquiry for the Court is the protection of the Tempur-Pedic Trade Dress, not Tempur-Pedic's trademark alone.

[9] During the hearing, Mattress Firm's counsel admitted to the similarity of designs between the overall display of the Pro-Adapt line and the Therapedic Premier line to the extent that

the Court finds that the trade dresses are similarly designed, consequently, this factor weighs in favor of Plaintiffs.[10]

3. Intent

With respect to the intent factor, Plaintiffs must show that not only did the Defendants copy the Tempur-Pedic Trade Dress, they did so with the intent to confuse costumers *See Yellowfin Yachts*, 898 F.3d at 1293 (stating that "proof of intentional copying alone is not conclusive"). There is an important distinction between intentional copying and intentional copying with intent to cause confusion. *Id.*; *see Brooks Shoe Mfg. Co.,* 716 F.2d at 859 n.13. Where a defendant intentionally copies a product, but not with intent to confuse consumers, the defendant's intent has little bearing on the ultimate question of whether the allegedly infringing product is likely to confuse consumers. *Yellowfin Yachts*, 898 F.3d at 1293; *see* J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23:110 (5th ed. 2017) ("[T]he only kind of intent that is relevant to the issue of likelihood of confusion is the intent to confuse."). When a defendant copies a design intending to cause confusion,

---

both lines displays "prototypical elements of a mattress showroom." (*See* Doc. 84, 80:11–21).

[10] The Court's conclusion is also supported by the Defendants' lack of intent and the fact that the Pro-Adapt line and the Therapedic Premier line are sold at different stores and that customers of luxury mattresses are most likely not impulse buyers. *Cf. Dippin' Dots, Inc.*, 369 F.3d at 1208 (describing ice cream novelties as impulse items sold to hurried shoppers, who are more likely to confuse similar products). Unlike items that would be purchased on impulse, a luxury mattress requires research on the part of the consumer. A consumer could easily note that the trademarks on both trade dresses are different. *See Vital Pharm., Inc.*, 511 F. Supp. 2d at 1316 (citing *Bristol-Myers Squibb Co. v. McNeil-P.P.C. Inc.*, 973 F.2d 1033, 1046 (2d Cir. 1992) (stating that "'when [a trademark is] prominently displayed it can go far towards eliminating any possible confusion'")). As stated in the Raymond James report, the aesthetic differences between the trademarks, including the border tailoring and the lack of an image on top of the Therapedic Premier, are enough "to give credence to the claim that the differences [between the marks] offset the similarities." (*See* Raymond James Report, Doc. 10-13 at 2).

however, the defendant's very action indicates that it expects consumer confusion.  *Yellowfin Yachts*, 898 F.3d at 1293.

Tempur-Pedic argues that Mattress Firm approached Therapedic seeking to "create a similar looking mark" to be displayed "in a confusing and similar way" on Mattress Firm's new line of luxury memory foam mattresses (Doc. 84, 20:20–25).  Tempur-Pedic cites to the Raymond James Report as evidence that Mattress Firm needed to develop a product to fill the void left by Tempur-Pedic's foam mattresses after the parties severed their business relationship. (*See* Raymond James Report, Doc. 10-13 at 2).  The Report explains that after losing Tempur-Pedic's luxury memory foam offering, Mattress Firm offered a line of memory foam mattresses known as the "Dream Beds," but this line was not as credible as the Tempur-Pedic brand. *Id*. On the other hand, the Report describes the Therapedic Premier line as a very important development and a credible memory foam offer poised to compete with the Tempur-Pedic brand.  *Id*. at 3.  While the Report describes similarities between the mattresses, the Report at no point shows that Mattress Firm copied the Tempur-Pedic Trade Dress with the intent to confuse the consumers.  In fact, the Report states that in visits to Mattress Firm's stores in Tampa and Washington, D.C., the sales professionals noted that Mattress Firm "no longer carried Tempur-Pedic and attempted to demonstrate the memory foam mattresses it did offer." *Id*. Therefore, the evidence before the Court falls short of demonstrating Mattress Firm intended not only to emulate the Tempur-Pedic's Pro-Adapt line, but also to confuse consumers as to the origin of both. Consequently, the undersigned finds that this factor weighs in favor of Defendants.

4.   Actual Confusion

For obvious reasons, "[a]ctual consumer confusion is the best evidence of likelihood of confusion." *AmBrit Inc.*, 812 F.2d at 1543.  While there is no precise number of instances of actual confusion required to establish this factor, the evidence adduced must be more than nominal. *See Yellowfin Yachts*, 898 F.3d at 1295.

Tempu-Pedic provides the Court with two alleged examples of consumer confusion. The first one is the Raymond James Report describing a series of similarities between the Therapedic Premier line and Tempur-Pedic's offering of foam mattresses in general.  The second one is an email describing a statement by a Mattress Firm employee who, after looking at a Therapedic Premier mattress online, exclaimed that the mattress "actually looks like Tempur-Pedic." (Doc. 84, 20:20–25; Anderson's Decl., Doc. 10, ¶ 47, Doc. 10-11).   While this evidence might suggest the <u>potential</u> for consumer confusion, neither of these examples are evidence of <u>actual</u> consumer confusion.  Notably, there is no evidence that any consumer has mistakenly bought a Therapedic Premier mattress believing it was a Tempur-Pedic Pro-Adapt mattress.  *See Vital Pharm., Inc.,* 511 F. Supp. 2d at 1318 ("[w]hen the bottom line is sales of a particular product, initial confusion prior to and concluding before the point of purchase does not seem dispositive in a likelihood of confusion analysis").  The undersigned finds that Plaintiffs have failed to provide evidence of consumer confusion at this stage of the proceedings; therefore, this factor weighs in favor of Defendants.

5.   Balancing of the Factors

Upon balancing all the factors, the Court finds that while there is a possibility of consumer confusion between the Therapedic Premier line and the Tempur-Pedic's Pro-Adapt line, this possibility does not rise to the level of a probability.  *Shatel Corp. v. Mao Ta Lumber &*

*Yacht Corp.*, 697 F.2d 1352, 1355 n.2 (11th Cir. 1983) ("[l]ikelihood of confusion is synonymous with 'probable' confusion, it is not sufficient if confusion is merely 'possible'"). In reaching this conclusion, the most important factors were the lack of actual confusion followed by weakness of the Tempur-Pedic Trade Dress.

As stated above, to prevail on their claim for trade dress infringement under the Lanham Act, Plaintiffs must establish that the claimed trade dress is distinctive, primarily non-functional, and that the trade dresses are confusingly similar.  Because the undersigned finds that the Tempur-Pedic Trade Dress is not distinctive and that consumer confusion is not probable in this case, the Court finds that Plaintiffs failed to establish a likelihood of success on the merits at this stage of the proceedings. [11]

## II.     Irreparable Harm

Tempur-Pedic argues that it is being irreparably harmed because it has lost control of its reputation and customer goodwill.  Specifically, Tempur-Pedic claims that is unable to control the quality of the goods offered by Therapedic, including the offered warranty. (Doc. 9 at 23–4).  To support its argument, Plaintiffs direct the Court's attention to *Bentley Motors Ltd. Corp. v. McEntegart*, for the proposition that "[g]rounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill."  899 F. Supp. 2d 1291, 1302 (M.D. Fla. 2012) (citing *Ferrellgas Partners, L.P. v. Barrow*, 143 F. App'x. 180, 190 (11th Cir. 2005)).  *Bentley*, however, is distinguishable.

---

[11] In addition, nothing on the record supports a finding that Therapedic, as the licensor of the trademark "THERAPEDIC," or Sinomax as the manufacturer of the mattresses have infringed on the Tempur-Pedic Trade Dress.  In fact, nothing in the record supports a finding that these companies were involved in the marketing of the Therapedic Premier line in gallery store presentations, used split-screen posters or a snowflake design, or that these companies sell or promote the Therapedic Premier line (*See* Stagner's Decl., Doc. 45-1, ¶10).

In *Bentley*, the Court began by recognizing that a presumption of irreparable harm in cases where a plaintiff has established likelihood of success on the merits may not be applicable to preliminary injunctions under the Lanham Act. *Bentley,* 899 F. Supp. 2d at 1302. Then, the Court held that even in the absence of a presumption of irreparable harm, Bentley demonstrated irreparable harm because it showed that "there [was] a risk that the public perception of [Bentley's] high-quality products was diminished if [the defendants were] allowed to continue the sale and distribution of [their] knock-offs." *Id.* at 1303. Underlying the Court's decision, and independently of whether a presumption of irreparable harm applied to that case, was the Court's finding that likelihood of confusion among the automobiles offered by Bentley and the defendants existed. *Id.* As discussed above, no likelihood of confusion exists in the matter at hand.

Nevertheless, Plaintiffs, having failed to establish a likelihood of success of the merits, cannot establish irreparable harm. *See Hi-Tech Pharms., Inc. v. Health Prods.*, 132 F. App'x 348, 350 (11th Cir. 2005) (per curiam) (affirming a district court decision finding that no irreparable harm existed where there was no likelihood of success on the merits). Overall, the Court finds that Plaintiffs have not demonstrated that irreparable harm would occur without an injunction.

### III.    Balance of Harm

The third element that Plaintiffs must show to obtain a preliminary injunction is that the threatened injury to Plaintiffs outweighs the potential damage that the proposed injunction may cause to Defendants. *Davidoff & Cie, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1304 (11th Cir. 2001). Tempur-Pedic argues that in addition to suffering diversion of customers and the ability to control its reputation, Defendants have no legally protectable

interest in continuing to infringe upon the Tempur-Pedic Trade Dress.   Tempur-Pedic, however, failed to establish trade dress infringement by the Defendants.   In addition, the evidence in the  record does not indicate that the Therapedic Premier line of mattresses is of such poor quality that it could damage Plaintiffs' reputation in the market if it was confused with the Pro-Adapt line.   Indeed, the evidence produced by Plaintiffs shows that the Therapedic Premier line is a step up from previous attempts to enter into the luxury foam market and that the line is selling well among consumers. (*See* Raymond James Report, Doc. 10-13 at 2).   The record is absent of any customer complaints about the quality of the mattresses (*See* Stagner's Decl., Doc. 45-1, ¶14).   In sum, even if consumers were confused about the source of the mattresses, there is no evidence of loss of consumer goodwill or reputation.

Mattress Firm, on the other hand, argues that the issuance of an injunction in this case would harm it significantly.   Specifically, the evidence suggests that an injunction would deprive Mattress Firm of the benefit of its license to use the Therapedic mark to sell the Therapedic Premier line, it would force it to discontinue the product line and lose anticipated sales of that product, and it would cause it to lose the substantial investment of time and resources put into developing the marketing of the Therapedic Premier product line.   (Doc. 45 at 25).   Overall, the Court finds that Plaintiffs' potential loss of reputation and goodwill does not outweigh the tangible harm an injunction would cause the Defendants.   Therefore, the balance of harm factor tips in favor of Defendants.

## IV.    Public Interest

The public interest is served by preventing consumer confusion in the marketplace. *Davidoff & CIE, S.A.,* 263 F.3d at 1304 (citing *SunAmerica Corp. v. Sun Life Assurance Co. of*

24

*Canada*, 77 F.3d 1325, 1334 (11th Cir. 1996)).   Here, the Court finds that despite the similarities between the Tempur-Pedic Pro-Adapt line of mattresses and the Therapedic Premier line, Plaintiffs have not sufficiently demonstrated the likelihood of confusion in the marketplace; therefore, Plaintiffs failed to demonstrate that the injunction would not be adverse to the public interest.

## CONCLUSION

As discussed above, "[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the 'burden of persuasion' as to the four requisites." *All Care Nursing Serv., Inc.,* 887 F.2d at 1537.   Because Plaintiffs have not met this burden, it is recommended that Plaintiffs' Motion for a Preliminary Injunction be denied.

Accordingly, it is hereby

RECOMMENDED:

Plaintiffs' Motion for a Preliminary Injunctive Relief (Doc. 8) be DENIED.

IT IS SO REPORTED in Tampa, Florida on January 11, 2018.


SEAN P. FLYNN
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO THE PARTIES

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions.   A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation.   *See* 11th Cir. R. 3-1.

cc:     Hon. Virginia M. Hernandez-Covington
        Counsel of record.